# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

KURTIS JONES,            )
      Plaintiff,          )
                      )
      v.               )     CAUSE NO.: 4:04-CV-83-PRC
                      )
JO ANNE B. BARNHART,    )
Commissioner of the Social Security  )
Administration,           )
      Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Kurtis Jones, on November 16, 2004, and on a Brief in Support of Complaint [DE 21], filed by Jones on May 2, 2005. Jones seeks judicial review of a final decision of the Defendant, the Commissioner of the Social Security Administration, in which Jones was denied Disability Insurance Benefits ("DIB") under Sections 216(1) and 223 of the Social Security Act. For the following reasons, the Court denies Jones' request to reverse and remand the decision of the Commissioner.

## PROCEDURAL BACKGROUND

On July 9, 2001, Jones filed an application for disability insurance benefits alleging disability as of December 28, 2000, due to chronic obstructive pulmonary disease (COPD), emphysema, colitis, chest pain, urticaria, and hyperreflexia with muscular atrophy. The application was denied initially on September 4, 2001, and upon reconsideration on January 3, 2002. Jones then filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The hearing before ALJ M. J. Adams was conducted on April 14, 2003, in Lacey, Washington. At the hearing, testimony was heard from Vocational Expert ("VE") Mary Minton, M.A. On July 11, 2003, the ALJ issued

a decision, finding that although Jones had severe impairments,[1] he nevertheless was not disabled because he retained the residual functional capacity ("RFC") to do a modified range of light work[2] and remained capable of performing a significant number of jobs in the economy.  The ALJ considered Jones' age, education, past work experience, RFC, and the testimony of the VE, in making the following findings:

(1)     The claimant met the disability insured status requirements of the Act on December 28, 2000, the date that the claimant stated he became unable to work, and he has sufficient quarters of coverage to remain insured through at least December 31, 2006.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset date.

(3)     The claimant has chronic obstructive pulmonary disease (COPD) with emphysema; status-post left pneumothorax; and hyperreflexia of the left leg. These impairments are severe, but do not meet or equal the criteria of any impairment listed in 20 C.F.R. Subpart P, Appendix No. 1.

(4)     The claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of information contained in the medical reports and other evidence of record.

(5)     The claimant retains the residual functional capacity to perform light work. He should avoid exposure to extremes of heat or cold, and extreme exposure to inhaled agents such as dust or smoke.  He can work in an air-conditioned environment.

(6)     The claimant's impairments and limitations preclude him from returning to his past relevant work.

(7)     The claimant was born [in] 1962 and he has at least a high-school education.

---

[1] A "severe impairment" is defined by 20 C.F.R. § 404.1520(c) as an impairment that significantly limits a claimant's ability to perform basic work activities.

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

(8)     If the claimant were able to do a full range of light work, 20 C.F.R. §404.1569 and Rule 202.21 of Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion that the claimant is not disabled.

(9)     Although the claimant is unable to perform a full range of light work, he is capable of performing other work that exists in substantial numbers, such as hand packager (DOT 559.687-074), with approximately 5,100 state jobs and 31,000 jobs nationally; document preparer/microfilm operator (DOT 249.587-018), with 7,000 state jobs and 177,000 jobs in the nation; and industrial order clerk (DOT 221.367-022), with 4,800 state jobs and 49,000 jobs nationally. Thus, he is not disabled within a framework of the above-cited rule.

(10)    The claimant has not been under disability, as defined in the Social Security Act, at any time through the date of this decision.

R. at 23-24.

On August 8, 2003, Jones filed a Request for Review of Hearing Decision with the Appeals Council, which was denied on September 17, 2004. Therefore, the ALJ's decision of July 11, 2003, is the final decision of the Commissioner.

A Complaint was timely filed by Jones with this Court on November 16, 2005, and on May 2, 2005, Jones filed a Brief in Support of Complaint. On July 6, 2005, the Commissioner filed a Defendant's Memorandum in Support of Commissioner's Decision. Jones then filed a Reply Brief on July 28, 2005.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A.  Background Information

Jones was born in 1962, and was 40 years old at the time of the ALJ's decision.  Jones attended school through the eleventh grade, eventually earned his GED, and attended vocational schools to become certified as a welder.  Jones worked as a welder at the same company for over thirteen years, until December 2000.

### B.  Medical Evidence

In January and February 2000, Imad E. Khadra, M.D. treated Jones for a large left side pneumothorax with an element of marked tension and some shift of the heart and mediastinum to the right.  Dr. Khadra inserted and removed a tube in Jones' chest, and kept him in the hospital for one week.  Dr. Khadra told Jones to take the rest of the week off from work, to avoid heavy lifting, and to quit smoking, because Jones was smoking one to two packs of cigarettes per day for a history of 20 years.  In February 2000, Dr. Khadra saw Jones for post left thoracotomy chest wall pain, confirmed that there was no evidence of residual pneumothorax, and released Jones to work but instructed him not to lift or carry heavy objects.  Dr. Khadra still expressed concern that while Jones had reduced his smoking, he still smoked at least one-half to one pack per day.

In October 2000, Jones complained of back pain and Jerry Douglas, M.D., prescribed Vicodin.  Based on a history of ischemic colitis Jones was also prescribed Coumadin on a regular basis, which he had taken for the past two to three years.  The following month, in November 2000, Jones had a small knot behind his right knee and Dr. Douglas prescribed antibiotics.  R. at 171.

4

In December 2000, Jones began to complain of chest pain, but he did not have shortness of breath, and his lungs were clear.  The pain was not controlled by Vicodin.  Dr. Douglas subsequently identified a resolving hematoma in the chest, which was verified with a CT scan.  Jones was diagnosed as having upper chest wall pain, a history of pneumothorax, ischemic bowel disease on Coumadin, and hematoma left hamstring.

Dr. Douglas also saw Jones for increased malaise since December 2000.  He was diagnosed by Dr. Douglas to have left upper chest wall with recent hematoma, ischemic bowel disease, cluster headache, and malaise.

In January 2001, Christopher Wilhelmson, M.D., also confirmed that the hematoma was healing, and Dr. Douglas later noted that it was fully healed.  Jones continued to complain of chest pain, though, and began to complain of headaches.  In January 2001, a CT scan showed a normal brain, resolving hematoma, and right lung calcified granulomas.

In February 2001, Dr. Douglas examined Jones for right upper chest soreness, finding some mild chest wall tenderness.  Dr. Khadra opined that Jones' chest pain was due to the hematoma and noted that Jones was still smoking at least one pack of cigarettes per day.  Carolyn Kochert, M.D., performed an intercostal block in an attempt to relieve the pain, but the attempt created another pneumothorax requiring Dr. Khadra to again insert a chest tube.  Within one day, the left pnuemothorax was completely resolved.  A chest x-ray showed that a left pleural effusion or left hemothorax developed, the left lung expanded, but no left pneumothorax was identified.  Dr. Kochert wrote a note excusing Jones from working for one week.  Dr. Douglas later prescribed Tylox to treat his pain and planned to fill out disability paperwork.  In March 2001, Dr. Douglas noted that Jones had some swelling and prescribed Norco for his complaints of pain.

In March and April 2001, Robert Bigler, M.D., an anesthesiologist and pain specialist, treated Jones' complaints of chest, back, and neck pain. Jones told Dr. Bigler that his pain worsened with movement, but was relieved by pain killers, and that he had been out of work for two months. Dr. Bigler performed an injection of the sternal costal joint, but the procedure did not give him relief. Dr. Bigler also noted that Jones was somewhat anxious. A March 2001 Magnetic Resonance Image ("MRI") showed a minimal T5-6 broad based disc bulge in his neck with no significant effect on the cord and no nerve root compression. Also, an elongated region of intermediate signal intensity was detected in the right lung apex, but it most likely represented a scar. Dr. Bigler thought the pain could be related to the disc bulge and prescribed Klonopin, Zanaflex, and Prozac.

Also in April 2001, Jones told Dr. Douglas that he had no respiratory complaints and his chest was clear on examination. Jones' only complaint was swelling. Dr. Douglas did find a positive trace presacral/lumbar edema and extremity trace edema. Dr. Douglas planned to send Jones to the Mayo Clinic because of his "unusual constellation of [symptoms]" and told Jones to keep off work through the end of May. Also Jones' weight loss and recent edema were noted.

In April 2001, Marc Estes, M.D., saw Jones at the emergency room for complaints of headaches and vomiting. Jones' breathing was clear to auscultation bilaterally without wheezes, rhonchi, or rales. Jones was on Temazepam, Coumadin, Prozac, and Maxzide. The diagnosis was acute cephalgia and vomiting; yet, Dr. Estes did not find anything abnormal and discharged Jones. Next, Jones visited Dr. Bigler in April 2001 and the impression provided was back and chest pain that may represent a thoracic radiculopathy, and neck pain that may represent a cervical facet arthropathy. Finally, Dr. Bigler performed a bilateral medical branch block into the masses at C3 through C7, which "significantly reduc[ed]" Jones' neck pain and increased his range of motion.

6

In May 2001, Jones was seen by physicians at the Mayo Clinic. The final diagnoses given by the Mayo clinic are: (1) COPD with emphysema, (2) history of colitis, (3) chest wall pain, (4) possible pressure induced urticaria, (5) depression, anxiety, and poor sleep hygiene, and (6) hyperreflexia with left-sided muscular atrophy. Jones' diffusing capacity had changed 47 percent, and he did not show improvement on his breathing tests after taking a bronchodialator. Warren Ketterling, M.D., concluded that Jones had COPD with emphysema and so needed to quit smoking, but added that Jones did not visit either their Pulmonary Medicine Department or Nicotine Dependency Center. Douglas B. McGill, M.D., a gastroenterologist and hepatologist, performed a colonoscopy and biopsy. He concluded that the colonoscopy was entirely negative, Jones did not have ischemic colitis, and should quit taking Coumadin. Dr. Ketterling believed that Jones' disc bulge was not likely the cause of his chest pain, based on the Mayo Clinic's MRI, but instead thought that the chest tube procedures and pleural irritation were the cause of his pain. Dr. Ketterling determined that a pain clinic should be able to control his discomfort. Jones complained of some localized swelling in areas where his clothes fit tightly, and Dr. Ketterling felt those complaints "sound[ed] most like pressure induced urticaria," but Jones did not see either an allergy specialist or a dermatologist. Dr. Ketterling noted that Jones complained of depression, anxiety, and sleep problems, but Jones did not see a psychiatrist at the Mayo Clinic. The Agency's call to the Mayo Clinic confirmed that the diagnosis of depression was based solely on Jones' medications. Finally, Devon Rubin, M.D., a neurologist, found that while Jones' legs were hyperreflexic and his left leg was smaller in circumference than the right, Jones had no symptoms and was not affected by these conditions. Overall, Dr. Rubin found that Jones' mental status and cranial nerve

examination were both normal.  However, his tone was notable for moderately severe spasticity in the left greater than in the right lower extremity.

In June 2001, Jones saw Dr. Douglas for a follow-up to his Mayo Clinic visit.  His diagnosis was chronic chest wall pain with a history of pneumothorax, COPD, and depression.  Jones was still taking Narco but was no longer taking Coumadin.  Dr. Douglas noted that Jones' activity level was increasing and considered starting Jones on an exercise program.  Because this note in the record was cut off, it is not clear whether an exercise program was started.  Dr. Douglas saw Jones again in September 2001 and the diagnosis was chronic chest wall pain, COPD, and situational stress/depression.  Also, Dr. Douglas noted that Jones and his wife were divorcing.

In February 2002, Dr. Douglas stated that Jones still complained of chest wall pain, even though the Mayo Clinic workup had been negative.  Jones  also complained of vomiting, which Dr. Douglas thought could be the result of Gastroesophageal Reflux Disease ("GERD"), or the anxiety and depression caused by Jones' pending divorce.  Dr. Douglas sent Jones to Joseph George, M.D., for an upper GI study, which was normal.

In March 2002, at the request of Jones' counsel, Dr. Douglas filled out a form, noting that Jones was "disabled and unable to work."  In May 2002, Dr. Douglas filled out a questionnaire from Jones' counsel and opined that Jones could not perform sedentary, light, or medium work on a regular and sustained basis because he was in severe pain and because his medication may cause mild sedation.  In response to a question to explain how Jones' symptoms were caused by clinically demonstrated impairments, Dr. Douglas answered "yes"; however, Dr. Douglas did not identify the impairments or explain how they affected Jones.  Dr. Douglas also concluded that Jones was credible and not a malingerer.

Five months after his last doctor's visit, in July 2002, Jones returned to Indiana from Washington state and visited Dr. Douglas. Jones told Dr. Douglas that he had quit smoking, but the diagnosis showed that he still had chronic chest wall/pleuritic pain. Jones used Norco up to six times per day. Four months later, in November 2002, on Jones' last visit with Dr. Douglas, he still complained of chest pain, depression with insomnia, and nausea, though the examination showed his chest was clear. Norco usage was continued.

### C.  Reviewing Physician Opinion

In August 2001, W. Shipley, Ph.D., reviewed the record on behalf of the State agency. Dr. Shipley determined that Jones had no severe medical impairment.

In August 2001, A. Landwehr, M.D., reviewed the record on behalf of the State agency. Dr. Landwehr opined that Jones could sit and stand and/or walk six hours and lift ten pounds frequently and twenty pounds occasionally. Dr. Landwehr further opined that Jones had no postural limitation and that he could occasionally climb, balance, stoop, kneel, crouch, and crawl. Finally, Dr. Landwehr found that Jones' only other limitations were restrictions to avoid concentrated exposure to extreme heat and cold, wetness, humidity, and fumes. In December 2001, Sai R. Nimmagadda, M.D., affirmed Dr. Landwehr's assessment as reasonable.

### D.  Testimony of the Plaintiff

At the hearing, Jones stated that he was 40 years old and had completed both his GED and welding certification. He described his activities of daily living and symptoms in varying submissions to the Agency. In August 2001, Jones wrote that he regularly drove, cooked, read,

engaged in hobbies, did laundry, lawn work, and house cleaning.  However, he wrote that he did everything slower, and could only walk normally for one block and climb twelve steps, because he would get out of breath and have chest pains.  Jones wrote that this impairment prevented him from participating in his various hobbies, such as fishing.

On April 14, 2003, Jones testified at a hearing before the ALJ in Lacey, Washington.  Jones testified that he stopped working in December 2000, and drew unemployment benefits for a time, but was no longer eligible.  Jones testified that he felt depressed when he thought about how his life had turned out and that his pain is worse when he is depressed.  He stated that his pain, which is on the left side of his chest, is constant and worsens with physical exertion or changes in weather. Jones testified that his narcotic medication made him tired and affected his concentration.  He also claimed to be easily fatigued and stated that a shower or pushing the sweeper would wear him out for a few hours.  Also, changing a tire may cause him to lay down for two hours and some days he cannot get out of bed at all.  Jones claimed that most days he did not feel well enough to do more than lay on his couch, but on sunny days he would go fishing from a dock.  He further testified that he fished whenever he was able and the weather allowed, and had fished two weeks before the April hearing and, before that, the previous fall.

Jones testified that he had repeatedly tried to quit smoking, and was not smoking at the time of the hearing.  He had trouble quitting because he had a lot of free time, was depressed, and had been smoking since the age of five.  When asked when he had most recently quit, Jones first answered "months," then declared "a few weeks," then stated that he may "have had one a few days" earlier.  Jones stated that he does not buy cigarettes, but smokes when he is upset.  Because of the decreased smoking, his nausea is less intense, though he does not necessarily feel better.

10

**E.  Testimony of Vocational Expert**

VE Minton determined that an individual with Jones' age and educational background who was physically capable of performing light work as defined by the regulations, but only in an air-conditioned environment, would be able to perform several jobs.  The jobs the VE mentioned include a hand packager in plastic products, document preparer/microfiche operator, and industrial auto clerk, which are all light, unskilled jobs.  The VE stated that an employer would not likely tolerate an employee missing work on a regular basis more than one day each month.

**F.  The ALJ's Decision**

The ALJ found that Jones was capable of performing a modified range of light work. Considering Jones' age, education, past work experience, RFC, and the uncontradicted testimony of the VE, the ALJ concluded at step five that Jones was capable of performing a significant number of jobs in the economy and therefore was not disabled.

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from

engaging in any other type of substantial gainful activity that exists in significant numbers in the

economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry

to evaluate whether the claimant is entitled to benefits.  20 C.F.R. § 404.1520(a)(4).  The Seventh

Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe
> impairment; (3) whether the claimant's impairment meets or equals one of the
> impairments listed by the [Commissioner]; (4) whether the claimant can perform
> [his] past relevant work; and (5) whether the claimant is capable of performing work
> in the national economy.  Under the five-part sequential evaluation process, "[a]n
> affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that
> the claimant is disabled.  A negative answer at any point, other than Step 3, ends the
> inquiry and leads to a determination that a claimant is not disabled."  If a claimant
> reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable
> of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original);

*see also* 20 C.F.R. §§ 404.1520(a)(4)(I)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir.

2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.

"The RFC is an assessment of what work-related activities the claimant can perform despite [his]

limitations."  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The ALJ must assess the RFC

based on all the relevant evidence of record.  *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The

claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313

(7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the

reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the

important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55

F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not

required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski*, 245 F.3d at 888. The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

In his Brief, Jones argues that the ALJ's RFC finding is not supported by substantial medical evidence, that the ALJ's reliance on Jones' failure to quit smoking as a factor for credibility and RFC determinations is flawed, and that the ALJ did not give the opinion of Jones' treating physician, Dr. Douglas, the proper weight. In response, the Commissioner contends that the ALJ's RFC finding is supported by substantial evidence of record because the medical evidence fails to support Jones' allegations of disability, the ALJ properly weighed the medical source opinion evidence of record, substantial evidence supports the ALJ's finding that Jones' subjective complaints were not fully credible, and substantial evidence supports the ALJ's finding that Jones is not disabled and can perform a significant number of jobs in the economy. The Court will address each of Jones' arguments in turn.

## A.  Substantial Evidence Supports the ALJ's Determination

In his decision, the ALJ recognized that Jones has a combination of severe impairments, which include chronic obstructive pulmonary disease (COPD) with emphysema, status-post left pneumothorax, and hyperreflexia of the left leg.  However, he reasoned that "[t]hese impairments are severe, but do not meet or equal the criteria of any impairment listed in 20 C.F.R. Subpart P, Appendix No. 1."  R. at 23.  At step four of the analysis, the ALJ considered the specific objective medical evidence, the medical opinions of record, and Jones' subjective complaints to determine that he is neither capable of returning to his past work nor able to perform a full range of light work. However, the ALJ determined that Jones is capable of performing other work that exists in substantial numbers and thus he is not disabled.  R. at 24.

In this analysis, the ALJ fully recognized and set forth the history of all of Jones' medical situations, including the following:  his lungs previously collapsing, treatment for spontaneous left pneumothorax, chest pain related to chest tubes and some pleural irritation, COPD with emphysema, the negative Mayo Clinic workup, finding of a clear chest, left leg hyperreflexia and atrophy while performing vigorous work, nausea and vomiting due to ischemic colitis which was later found to not exist, normal GI examination, negative brain CT scan even though Jones alleges migraines, thoracic degenerative changes that do not add to Jones' discomfort, no severe back or neck pain, cured depression and lack of concentration due to antidepressants, nervousness, anxiety, poor sleep hygiene, no severe mental impairment, situational stress and depression, heavy breathing upon physical exertion, and smoking.

Jones argues that the ALJ incorrectly failed to evaluate his chest wall pain in the RFC determination.  However, the ALJ makes several references to Jones' chest wall pain.  In one

instance the ALJ states, "[t]he claimant reported the sudden onset of chest pain in December 2000 and again in January 2001.  In February 2001, the claimant had chest trauma complicated by a left pneumothorax, resolved with left side chest tube a few days later."  R. at 20 (citation omitted).  Later, the ALJ notes, "[t]he claimant continued to allege chest wall pain . . . ; his chest pain was related to his chest tubes and some pleural irritation." *Id*. (citations omitted).  The ALJ specifically noted the chest wall pain throughout his "Evaluation of the Evidence," and, although he did not specifically use the phrase "chest wall pain" in his "Findings," the ALJ does point to the status-post left pneumothorax, which is related to the chest tube insertion and chest wall pain.  Therefore, Jones' allegation that the ALJ erroneously failed to evaluate Jones' chest wall pain in arriving at the RFC is unfounded.

As for his smoking, labored breathing upon exertion, and other impairments, the ALJ relied on the opinion of the State Disability Determination Service consulting physician, Dr. Landwehr, who determined that Jones could perform light work specifically limited to occasional postural movement and some environmental restrictions.  Generally, the more consistent a medical opinion is with the record as a whole, the more weight an ALJ will give to that opinion.  *See* 20 C.F.R. § 404.1527(d)(4).  Here, the ALJ noted that the opinions of Dr. McGill and Dr. Ketterling were consistent with the objective medical evidence and based on that evidence.  The Court finds that the ALJ gave the proper weight to the testimony of Dr. Landwehr.  *See* 20 C.F.R. § 404.1527(d)(1)-(6) (setting forth the factors the ALJ must consider when assessing the weight of a medical opinion); 20 C.F.R. § 404.1527(f)(2) (providing that the ALJ consider opinions from qualified physicians who are experts in social security disability evaluation).  Dr. Landwehr's opinion is consistent with the medical evidence of record.

The ALJ has provided a logical bridge between the evidence of record and his decision.  The ALJ recognized Jones' current condition.  Moreover, the ALJ does not rely solely on Dr. Landwehr's opinion in making his determination but also independently considers the evidence of record and the opinions of the other physicians to make the administrative determination of Jones' RFC.  *See* R. at 20-23; *see also* 20 C.F.R. § 404.1527(e) (providing that the final responsibility for deciding a claimant's RFC is reserved to the Commissioner).

Finally, in arguing that the ALJ failed to fully evaluate Jones' chest wall pain, Jones does not suggest what additional limitations the ALJ should have found or what he believes an appropriate RFC would be with the analysis of chest wall pain that he believes should have taken place.  Accordingly, the Court finds that the ALJ's RFC finding of limited light work is supported by substantial evidence of record.

### B.  Credibility Determination

Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work.  20 C.F.R. § 404.1529(a).  However, subjective allegations of disabling symptoms alone cannot support a finding of disability.  *Id.*  The Social Security regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability:  (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence

of these symptoms.  20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

The ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making the credibility determination, Social Security Ruling 96-7p dictates that the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96-7p at *1. The Ruling provides that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p; *see Steele v. Barnhart*, 290 F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887.

Moreover, an ALJ is not required to give full credit to every statement of pain or to find a disability every time a claimant states that he or she is unable to work.  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding

18

symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence."' SSR 96-7p at *6.

Finally, an ALJ should not rely on a claimant's failure to quit smoking when making a credibility determination. *See Carroll v. Barnhart*, 291 F. Supp. 2d 783, 796 (N.D. Ill. 2003) (citing *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000)). "[T]he addictive nature of smoking" is "unrelated to the effects smoking may have on an individual's health." *Id*. Smoking can be used in a credibility determination if it is found that the claimant inconsistently states facts with regard to his smoking habit. *See Valencia v. Bowen*, 691 F. Supp. 1120, 1124 (N.D. Ill. 1988). For example, in *Valencia*, the claimant made inconsistent statements about how many packs per day she smoked, which was held to be an appropriate credibility consideration. *Id*. However, even if the ALJ relies on the claimant's failure to quit smoking as a part of his credibility determination, reversal is not warranted if the ALJ correctly calculated the RFC and the VE testified that the claimant's situation would not preclude employment; therefore, reliance on the claimant's smoking habits has no determinative effect on the claimant's credibility finding if other sufficient factors are also considered. *See id*.; *Carroll*, 291 F. Supp. 2d at 796.

As set forth in detail in Part A above, the ALJ thoroughly considered the medical evidence of record and evaluated Jones' testimony in light of that record. The ALJ recognized his responsibility to consider all the factors relating to Jones' disability under § 404.1529 and then allotted several full paragraphs to identifying the conflicts in the record between the medical evidence and Jones' subjective complaints of pain. R. at 20-21. The ALJ noted that the Mayo Clinic workup was negative and a GI examination was normal, that Jones was able to do vigorous welding work when he claims to have had a severe impairment, and that his thoracic degenerative

changes were reported to not have added to his physical discomfort even though he claimed he felt pain.  R. at 20-21.  Moreover, the ALJ relied on the testimony of Dr. Landwehr, a consultant for the State Disability Determination Service, and Dr. Landwehr found that the evidence of record did not support Jones' complaints and that he could perform light work.  R. at 21-22.  Later, Dr. Landwehr's opinion was confirmed by Dr. Nimmagadda.  R. at 210-11.

Jones argues that the ALJ wrongly relied upon his failure to quit smoking in his credibility and RFC determinations, and, therefore, they are flawed.  His smoking is permitted to be a part of his RFC determination because it does affect his health.  However, under *Carroll* and *Valencia*, Jones is correct in noting that his inability to quit smoking in itself should not be a part of his credibility determination, unless he stated an inconsistent fact at the hearing regarding his smoking habit.  The ALJ specifically stated that Jones' "marginal compliance with suggested treatment to stop smoking is a factor" in his credibility determination.  Yet, even if the ALJ considered this factor in error, it is not reversible error because it would not have affected the outcome.  Like in *Carroll*, in the instant matter the ALJ considered many other inconsistencies in the record, and all of Jones' health problems.  Even more, as in *Valencia*, Jones' statements are somewhat inconsistent in that he does not respond clearly when asked about his smoking, and he even goes as far as to state that he quit smoking and then in the same breath he quickly admits that he smoked within the past few days.

The ALJ also considered Jones' daily activities and found that they were not consistent with his complaints of disabling pain, observing that he drives, shops, does yard work, household cleaning, laundry, cooking, and fishes when the weather is nice.  By considering Jones' daily

activities, the ALJ specifically considered the effect of Jones' complaints of widespread pain on his ability to function on a day-to-day basis.

Accordingly, the Court finds that the ALJ adequately weighed Jones' subjective complaints of pain with the objective medical evidence and the medical opinions of record and considered the factors set forth in 20 C.F.R. § 404.1529. The ALJ considered the entire case record and articulated specific reasons for his credibility finding. Smoking was not the sole basis for the credibility determination but was only a factor, and, therefore, if any error exists, it is not reversible. Finally, the ALJ was in the best position to make the credibility determination because he observed Jones during the hearing. Jones has not demonstrated nor does the Court find that the ALJ's credibility determination is "patently wrong;" therefore, the Court will not reverse the credibility determination. *See Jens*, 347 F.3d at 213.

### C. Weight Given to Treating Physician Opinions

Jones next argues that the ALJ improperly discounted the opinion of Jones' principal treating physician, Dr. Douglas. The Commissioner responds that the ALJ's finding that Jones retained the RFC to perform limited light work that did not require exposure to polluted environments was supported by substantial evidence. The Court finds that the ALJ did not improperly discount the opinion of Dr. Douglas.

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Boiles*, 395 F.3d at 426 (citing *Clifford*, 227 F.3d at 870); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "More weight is given to the opinion of treating physicians

21

because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel*, 345 F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).   However, an ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Dixon*, 270 F.3d at 1178; *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).   The ALJ must discuss, at some level, how the evidence of record contradicts the treating physician's diagnosis.   *See Gudgel*, 345 F.3d at 470.

In support of his argument that the ALJ did not give the proper weight to his treating physician's opinion, Jones reasons that Dr. Douglas is Jones' family doctor and also a part of the Arnett Clinic.   Jones further argues that Dr. Douglas referred Jones to the Mayo Clinic and the Mayo Clinic's reports are consistent with Dr. Douglas' opinions, validating Dr. Douglas' own opinions. Jones generally argues that, because Dr. Douglas is Jones' "treating physician" and has been treating him continuously since November 2000, Dr. Douglas' opinions constitute valuable evidence of the status of Jones' disability.   Specifically, Jones questions the fact that the ALJ gives little or no weight to Dr. Douglas' May 2002 report and argues that the ALJ committed errors of law in doing so.

In April 2002, Dr. Douglas opined that Jones could not maintain regular and continuous work activity on a full-time basis due to pain from his impairment and sedation from prescribed medications; Dr. Douglas declared that Jones was disabled.   Then, Dr. Douglas gave several opinions in his May 2002 report, which was sent to him by Jones' attorney.   R. at 219-20.   The first

question asks if "[d]uring the time that [Dr. Douglas] ha[s] been treating Mr. Jones, has [he] been able, on a regular and sustained basis, eight hours a day, five days a week, to engage in sedentary, light or medium work as defined by the enclosed Social Security Definitions?  **If not, why not?**" R. at 219 (emphasis in original).  Dr. Douglas answered, "No.  Continues to have severe pain. Medication may cause some mild sedation."  Second, the question states, "Do you consider Mr. Jones' complaints to be credible?"  Dr. Douglas responded "yes."  Third, the report asked if Mr. Jones is a malingerer, and Dr. Douglas wrote "no."  Finally, the report asks if, in Dr. Douglas' opinion, Mr. Jones' complaints of "chest pain, shortness of breath, and fatigue [are] associated with clinically demonstrated impairments that could reasonably be expected to produce the claimed symptoms."  Dr. Douglas answered "yes."

The ALJ "carefully regarded" Dr. Douglas' opinions but reasoned that because Dr. Douglas "did not point to specific clinical findings and functional limitations in support of his statements[,] [h]is comments were merely conclusory."  R. at 20.  In fact, the ALJ points to Dr. Douglas' own notes which state that Jones' "chest was clear," that Jones at times had "no respiratory complaints," and in his opinion that the "Mayo Clinic evaluation was normal."  *Id.*

Generally, the ALJ was correct in noting the absence of reasoning and inconsistent statements made by Dr. Douglas.  This is not an instance of an ALJ failing to address relevant evidence or by drawing medical conclusions from the record without relying on the medical evidence.  *See, e.g., Dixon*, 270 F.3d at 1177 (citing *Clifford*, 227 F.3d at 870; *Green*, 51 F.3d at 101-02; *Hayes v. Railroad Ret. Bd.*, 966 F.2d 298, 303 (7th Cir. 1992)).  "Controlling weight is only given to a treating physician's opinion if it is 'not inconsistent' with other substantial evidence in the record."  *Hodges v. Barnhart*, 399 F. Supp. 2d 845, 857 (N.D. Ill. 2005) (citing 20 C.F.R.

404.1527(d)(2); *Winfield v. Barnhart*, 269 F. Supp. 2d 995, 1006 (N.D. Ill. 2003)).  Also, an ALJ

may rely on the opinions of consulting or non-treating physicians who specialize in social security

disability evaluation.  *Hodges*, 399 F. Supp. 2d at 857 (citing *Ellis v. Barnhart*, 384 F. Supp. 2d

1195, 1201-02 (N.D. Ill. 2005)).  In the instant matter, the ALJ specifically reviewed the reports of

Dr. Landwehr, Dr. Ketterling, Dr. McGill, and Dr. Douglas in his decision and was commenting,

based on the reports of those physicians, on the absence of certain evidence from the record that

would tend to support the more severe condition claimed by Jones.  *See, e.g.*, *Back v. Barnhart*, 63

Fed. Appx. 254, 259, No. 02-3486, 2003 WL 1878956 at *5 (7th Cir. Apr. 11, 2003).

        Dr. Douglas' blanket conclusion that Jones is disabled is contradictory to his notes that

Jones' chest was clear and the Mayo Clinic evaluation was normal, and, therefore, the ALJ can reject

his opinion.  *See Griffith v. Callahan*, 138 F.3d 1150, 1155 (7th Cir. 1998) (rejecting a treating

physician's opinion because a later opinion contradicted an earlier opinion and was not supported

by "objective findings of deterioration") (citing *Knight*, 55 F.3d at 313-14; *Edwards v. Sullivan*, 985

F.2d 334, 337 (7th Cir.1993)), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th

Cir. 2003).  Also, it is the ALJ who is charged with determining the ultimate issue of disability, and,

therefore, because it is void of reasoning, Dr. Douglas' opinion finding Jones to be "disabled" is not

helpful to the ALJ's ultimate decision.  *See* 20 C.F.R. § 202.1527(e).

        As argued by the Commissioner, Dr. Douglas' statement that Jones' chest wall pain

interfered with normal functioning does not constitute a medical "opinion" within the meaning of

the regulations because the statement did not identify the severity of Jones' impairment and his

abilities and/or restrictions.  *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from

physicians and psychologists or other acceptable medical sources that reflect judgments about the

nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); SSR 96-2p (providing that a medical opinion is an opinion on the issue of the nature and severity of an individual's impairment).  Dr. Douglas never states in his report if the "medications" that "may cause some mild sedation" to which he is referring are the same medications that Jones is currently taking.  Further, Dr. Douglas does not define "some mild sedation."

Also argued by the Commissioner is the fact that, in his determination, the ALJ gave less weight to Dr. Douglas' opinion on Jones' physical abilities and stamina, in part, because it appeared it was based on Jones' own subjective statements.  In fact, Dr. Douglas based his opinion of Jones' disability status on the fact that Jones claims to have severe pain, he takes drugs that "may cause some mild sedation," and that Jones' statements to him were credible.  Dr. Douglas' opinion was based on the assumption that Jones was credible and so was of less value.  A medical expert's report is not entitled to controlling weight when it is based solely on a complainant's own subjective complaints.  *See Carradine v. Barnhart,* 360 F.3d 751, 777 (7th Cir. 2004) (citing *Butera*, 173 F.3d at 1057) (doctor's opinion not entitled to controlling weight where physician "did not obtain any evidence beyond . . . [patient's] subjective complaints . . . .")); *see also Rice*, 384 F.3d at 371 ("And medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.") (citing *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989)); *Dixon*, 270 F.3d at 1178 (citing *Diaz*, 55 F.3d at 308).  In this case, Dr. Douglas did have objective tests to consider in addition to Jones' statements.  However, as set forth above, the objective tests do not support the severity of limitation found by Dr. Douglas.

More importantly, Jones' statements were consistent with the reviewing physicians' opinions and the ALJ's RFC determination.  First, Jones either stated on reports or testified that he could walk slowly and perform daily activities such as showering, getting dressed, cooking, dusting, laundry, driving, and yard work.  R. at 78.  Jones also explained that he had difficulties breathing when he tried to hurry.  *Id*.  Although light work may require substantial walking, it does not specifically require that the walking be performed at a hurried pace.  *See* 20 C.F.R. § 404.1567(b).[3]  Jones further noted that one of his two methods of "getting around town" is walking.  R. at 74.  In addition, Jones reported that he could lift up to 25 pounds, which is more than the maximum required with light work.  R. at 78; *see* 20 C.F.R. § 404.1567(b).  Therefore, Jones' own statements support the ALJ's finding that he can perform light work within an air conditioned setting.

Based on the foregoing, the Court finds that the ALJ did not err in giving little weight to Dr. Douglas' inconsistent opinions and in characterizing Dr. Douglas' comments as "conclusory."  In addressing Dr. Douglas' statements, the ALJ adequately considered and weighed the other medical evidence of record as well as Jones' testimony.  *See* 20 C.F.R. § 404.1527(d) (stating that when no physician's opinion is given controlling weight, all opinions are weighed against other medical

---

[3]  Pursuant to the regulations, light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  Sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

26

opinions on the basis of treating relationship, physician's specialty, consistency with the record, and objective medical support).

In making his RFC determination, the ALJ relied, in part, on the opinion of Dr. Landwehr, a reviewing physician, who opined that Jones did not have any exertional, manipulative, visual, or communicative restrictions, but that Jones did have some postural limitation and needed to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and extreme cold and heat.  Dr. Nimmagadda reviewed Dr. Landwehr's report and concurred.  R. at 210-11.  "An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."  *Gudgel*, 345 F.3d at 470 (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)), *cited in Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 1994).  In this matter, the ALJ agreed with the reviewing physician's determination only after having reviewed all of the medical and non-medical evidence set forth above.  In addition, the ALJ recognized in his decision that the reviewing physicians did not have all the current evidence at the time of their determinations.  The ALJ's decision to reject or give less weight to Dr. Douglas' opinion was not based solely on the opinions of Dr. Landwehr and Dr. Nimmagadda.

In addition, although Dr. Douglas classified Jones as disabled, Jones is not entitled to disability benefits solely on the statement of his physician that he is "disabled" or unable to work.  *Dixon*, 270 F.3d at 1177 (citing *Clifford*, 227 F.3d at 870).  Rather, it is the ALJ, not the doctor selected by the Plaintiff to treat him, who is vested with the ultimate authority to decide whether the Plaintiff is "disabled" within the meaning of the Act.  *Id*. (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(e)(1)); *see also* § 404.1527(e)(1); SSR 96-5p; *Barnett v. Barnhart*, 381 F.3d 664, 669

(7th Cir. 2004) (holding that, "although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion"); *Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002); *Dixon*, 270 F.3d at 1177.[4]

The Court notes that Jones does not object to the ALJ's findings at step five of the analysis based on the VE's testimony. Because the Court finds that the ALJ's RFC determination is supported by substantial evidence and because the ALJ found at step 5 that Jones can perform a significant number of jobs in the regular economy, Jones is not disabled for the purposes of "the step 5 analysis" or "disability benefits."

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination at steps four and five of the sequential disability analysis was supported by substantial evidence. Therefore, the Court **DENIES** the Brief in Support of Complaint [DE 21]. The Court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 17th day of January, 2006.

s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

---

[4] In *Dixon*, the Seventh Circuit recognizes the "biases that a treating physician may bring to the disability evaluation." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Court reasoned:

The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

*Id.*